FILED

JUL -6 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) No. | **4:17CR304 RLW** |
| JOHN DAILEY, ) | |
| Defendant. ) | |

## INFORMATION

### COUNT I
### HEALTH CARE FRAUD SCHEME
### 18 U.S.C. § 1347(a)(1) and 2

The United States Attorney charges that:

Aggeus Contracts with Facilities

1. At all times relevant to this Information, Aggeus had its headquarters in Chicago, Illinois. Aggeus employed or contracted with marketers, who traveled throughout the United States. Aggeus marketed itself as a provider of ancillary services to residents of nursing homes and other long-term care facilities (collectively referred to hereafter as facility or facilities). These ancillary services included, but were not limited to podiatry services. With respect to podiatry services, Aggeus marketers informed the facilities that an Aggeus podiatrist would treat every resident in the facility, regardless of insurance.

2. A variety of skilled nursing facilities entered into contracts with Aggeus. The skilled nursing facilities had to provide routine foot care, either by having the nursing home staff provide the service or by paying others to provide the service. Aggeus' offer to provide foot care at no cost to the facility freed up the facility staff and resulted in a financial benefit to the facility.

Aggeus Contracts with Podiatrists

3. Aggeus contracted with podiatrists throughout the United States and scheduled the podiatrists to travel to facilities on a periodic basis to render care. The contracts between Aggeus and the podiatrists typically provided that the podiatrists would receive a base salary, plus additional sums based upon the number and type of services the podiatrists performed. Aggeus and affiliated companies provided services in at least 16 different states.

The Medicare Program

4. The Medicare Program ("Medicare") is a federal health benefits program, as defined by 18 U.S.C. § 24(b). Medicare provides benefits to persons who are sixty-five years or older or disabled. In general, Part A of the Medicare Program authorizes payment of federal funds for in-patient care in hospitals and skilled nursing facilities, while Medicare Part B authorizes payment for outpatient health services. Individuals who receive benefits under the Medicare Program are referred to as Medicare "beneficiaries."

5. The United States Department of Health and Human Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS acts through fiscal agents, which are private companies that process provider applications, review claims, and make payments to providers for services rendered to Medicare beneficiaries. These companies are called Medicare Administrative Contractors (MACs).

Medicare Provider Enrollment

6. To receive Medicare reimbursement for services provided to eligible beneficiaries, health care providers, including podiatrists, must submit a written application and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.

7. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes. A health care provider uses the provider number to file claims with Medicare to obtain reimbursement for medically necessary services provided to eligible Medicare beneficiaries.

Medicare Coverage of Podiatry Services

8. The Medicare Program reimburses health care providers, including podiatrists, for certain medically necessary foot care services provided to eligible beneficiaries. Medicare pays providers directly or pays the employer, if the provider has assigned the payments to the employer.

9. The Medicare Benefit Policy Manual (hereafter Medicare Manual) sets forth the Medicare rules for what services are covered and will be reimbursed by Medicare. With few exceptions, the Medicare program does not pay for routine foot care. The Medicare Manual states that the "[s]ervices that normally are considered routine and not covered by Medicare include the following:

- The cutting or removal of corns and calluses;
- The trimming, cutting, clipping, or debriding of nails; and
- Other hygienic and preventive maintenance care, such as cleaning and soaking the feet, the use of skin creams to maintain skin tone of either ambulatory or bedfast patients, and any other service performed in the absence of localized illness, injury, or symptoms involving the foot. Medicare Manual, Chapter 15, § 290, Foot Care.

10. "Foot care that would otherwise be considered routine may be covered when systemic conditions such as metabolic, neurologic, or peripheral vascular disease result in severe circulatory embarrassment or areas of diminished sensation in an individual beneficiary's legs or feet." Medicare Manual, Chapter 15, § 290, Foot Care.

3

11. "In the absence of a systemic condition that results in circulatory embarrassment, foot care that would otherwise be considered routine may be covered for an ambulatory patient if there is clinical evidence of mycosis of the toenail and the individual beneficiary has marked limitation of ambulation, pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate. For a non-ambulatory patient, treatment of mycotic nails may be covered if there is clinical evidence of mycosis of the toenail and the individual beneficiary suffers from pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate." Medicare Manual, Chapter 15, § 290, Foot Care.

12. "Mycosis is a chronic, communicable infection caused by a fungus which is particularly prevalent in elderly people. Nail debridement involves removal of a diseased toenail bed or viable nail plate. This may be performed manually with an instrument or with an electric grinder." HHS/OIG, Medicare Payments for Nail Debridement Services, June 2002.

13. The Medicare Manual gives numerous examples of underlying diseases that "might justify coverage for routine foot care." The Medicare Manual further states that "[r]elatively few claims for routine-type care are anticipated considering the severity of conditions contemplated as the basis for this exception. Claims for this type of foot care should not be paid in the absence of convincing evidence that nonprofessional performance of the service would have been hazardous for the beneficiary because of an underlying systemic disease." Medicare Manual, Chapter 15, § 290, Foot Care.

14. The Medicare Manual also states that if certain class findings are documented (for example edema, burning) there is a presumption of coverage because of the evidence of findings consistent with a diagnosis of severe peripheral involvement. Medicare Manual, Chapter 15, § 290, Foot Care.

Medicare Record Keeping Requirements

15.     Medicare regulations require providers, including podiatrists, to maintain complete and accurate medical records reflecting, in part, the purpose of the visit, the patients' chief complaint giving rise to the visit on that day, the medical assessment and diagnoses of the patients and the actual treatment and services provided. These medical records must include sufficient information to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the provider. Medicare providers must retain clinical records for the period of time required by state law or five years from the date of discharge if there is no requirement in state law.

Medicare Claim Review and Reimbursement Process

16.     As stated above, the MACs are private entities that act as fiscal agents for the Centers for Medicare and Medicaid Services. The MACs review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service. Because Aggeus operates in numerous states, more than one MAC received and processed Aggeus reimbursement claims.

17.     A Medicare reimbursement claim must include certain information, including the beneficiary's name and Medicare number, the services that were provided to the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care professional who provided the services. The reimbursement claim must also contain the Common Procedural Terminology (CPT) code that identifies each procedure or service provided. Reimbursement amounts are based on the CPT codes.

18. Medicare paid Aggeus, through the various Medicare provider numbers, via electronic funds transfer. The majority of the electronic funds were deposited directly into the primary Aggeus corporate bank account.

Aggeus Electronic Medical Records System

19. In order to bill for services, an Aggeus podiatrist had to input data about his patient encounters into an Electronic Medical Records ("EMR") system created by the principal owner of Aggeus, Yev Gray. After the podiatrist input the data, a patient progress note was created, which supported the claim for reimbursement to Medicare for the services provided. The podiatrist had to review and attest to the accuracy of the patient progress note that was created.

20. The EMR system created by Yev Gray was a point and click system that required the podiatrist to make certain selections in various categories to document the patient encounter. When a selection was made, the patient progress note would auto-populate with certain canned language that was designed to ensure that Medicare would reimburse the claim, even though the canned language did not always accurately reflect the patient's condition.

Defendant's Participation In Fraud Scheme

21. In or about October 2011, the defendant entered into a contract with Aggeus to provide podiatry services to residents of nursing homes and other long-term facilities. The initial contract provided, among other things, that the defendant would receive an annual salary of $175,000, a company car, a company credit card, and health benefits. The original contract was later revised upward, at the defendant's request. Under the revised contract, if the defendant treated 650 or fewer patients in a month, he was paid about $14,583 per month, based on an annual salary of $175,000. If the defendant saw more than 650 patients in a month, he earned an extra $50 for each patient in excess of 650 patients.

6

22. In an April 1, 2012 e-mail to James Sayadzad, Dr. Dailey reported that his monthly number of patients was increasing drastically. He reported that in October 2011 he saw 221 patients; in November, 337; in December, 467; in January 2012, 602; in February, 687 and in March, 793. In responding to complaints Aggeus relayed to him from nursing home facilities about inconsistencies in physician's notes about care viz- a-viz the patient's actual physical condition, Dr. Dailey responded that "this is preprinted text in the form of a template..." and, "with the volume I see you certainly can't type everything separately or individually." In fact, from early on in his tenure with Aggeus, Dr. Dailey was instructed on what code to input for I&D. However, Dr. Dailey knew that this code was not the proper code and did not reflect the procedure that he actually performed.

23. Dr. Dailey continued to have trouble keeping up with his "billings and codings." As early as January 24, 2012, responding to complaints from Aggeus that he had not finished a batch of superbills (by clicking "Finalize All"), he replied, "As per your request; you have my permission to finalize them all again on the batches that you have."

24. Therefore, because of the large number of patients that he chose to see every day, Dr. Dailey simply chose to "point and click" on the procedure code he was instructed to use, and typically simply entered the highest, or next to highest CPT code to report evaluation and management ("E&M") services purportedly provided to the patient. There are several levels of E&M codes for both new and established patients, which reflect the time spent with the patient and the complexity of the issue the provider addressed during the encounter with the patient.

25. Dr. Dailey did not prepare his charts as he worked; he always prepared them, at the earliest, the evening of the day patients were seen, and, at the latest, on the following weekend. He utilized the schedule of patients he was handed when he entered a given nursing home, and then made brief handwritten notes on those schedules in preparing his superbills for

7

submission to Aggeus. Because Dr. Dailey chose to see a high volume of patients, he chose not to review the automatic, self-populating language that appeared upon clicking the code for procedures performed. This approach resulted in bills that reflected not only greatly excessive E&M services, but that also reflected excessive incision and drainage of abscess ("I&D") procedures.

26. In addition to seeing a large number of patients per day, the defendant billed far more procedures in a day than he could have performed in a day. The following are examples of days that the defendant submitted bills for excessive E&M and I&D procedures on the same day. The second column reflects the minimum number of hours that the defendant would have had to see patients to perform all the services for which he billed. The hours indicated below do not include time that the defendant spent traveling, eating, or sleeping. Also of significance, the defendant's patients were residents of nursing home and long term facilities and the defendant could not have treated them late in the evening or at night.

| Date | E&M Codes Billed | Hours of Work | I&D Codes Billed |
| --- | --- | --- | --- |
| 2/21/12 | 65 | 19 | 35 |
| 3/8/12 | 67 | 28 | 35 |
| 4/30/12 | 66 | 20.3 | 55 |
| 5/1812 | 84 | 23.2 | 24 |
| 7/9/12 | 76 | 20.3 | 36 |
| 7/11/12 | 66 | 27.5 | 24 |

27. In order to receive payment from Aggeus, the defendant had to submit and certify a patient progress note to each patient for whom he submitted a bill. Early in his employment with Aggeus, the defendant recognized that the patient progress notes generated by the EMR system contained one or more false statements. However, the defendant continued to submit

8

bills to Aggeus for the reimbursement of his services. Dr. Dailey knew that the auto-populated language would not accurately reflects the condition of many of his patients or the procedures that he performed.

Levering Patient C.B.

28.     C.B, a resident at Levering Regional Care Center ("Levering"), has been wheelchair bound since his admission to Levering in about 2003. On or about July 2, 2012, the defendant created a progress note that falsely stated that C.B. "presented ambulatory" and "the patient or staff request treatment, because, the toenails are painful to such a degree to affect ambulation and balance. . . . I have been requested to evaluate and treat symptomatic, painful, digital nail   deformities . . ."

29.     The note is unquestionably false, because C.B. was non-ambulatory and thus the defendant could not have found that C.B.'s nails affected his ambulation or balance. Despite knowing the note was false, the defendant attested to the accuracy of the aforementioned progress note. Further, the defendant knew that this note would be used to comply with Medicare's requirement that all services be documented in writing. On or about July 13, 2012, Aggeus submitted a claim to Medicare for payment for the defendant's treatment of patient C.B. on or about July 2, 2012.

Levering Patient C.W.

30.     During 2012, C.W. was a resident at Levering in the skilled nursing part of the facility. C.W. was completely incapacitated due to an intracranial bleed and traveled around the facility in a Geri-chair. In 2012, C.W. could not speak, but would moan if she was in pain. On or about June 14, 2012 and again on or about July 2, 2012, the defendant created a progress note that falsely stated that C.W. "presents ambulatory." That note also falsely stated that there was "pains and lesions bilaterally . . . Pain is paroxysmal and Intermittent." On June 22 and July 13,

9

2012, Aggeus submitted the claims for the services the defendant purportedly provided on June 14 and July 2, 2012.

Levering Patient C.M.

31.  During 2012, C.M. was a resident at Levering. On or about July 2, 2012, the defendant created a progress note that falsely stated that C.W.'s "skin turgor appears diminished consistent with age." This statement is false because C.M. was only 32 years old and diminished skin turgor is not consistent with a 32 year old. This statement obviously is just canned language that the defendant included in his notes to justify routine nail care. On June 22 and July 13, 2012, Aggeus submitted the claims for the services the defendant purportedly provided on June 14 and July 2, 2012. Aggeus managers (the defendant's unindicted co-conspirators) knew that the defendant was not providing all the services for which he was billing. However, the managers submitted the bills because the defendant was one of the highest billers at Aggeus.

32.  During the eight months of defendant's employment with Aggeus, Medicare paid Aggeus $703,726 for services purportedly provided by the defendant and billed under his provider number. The parties stipulate that the loss resulting from the defendant's fraudulent claims and statements-- for purposes of guidelines calculation --is $492,608.

Execution of the Health Care Fraud Scheme

33.  On or about July 13, 2012, in the Eastern District of Missouri,

**JOHN DAILEY**

the defendant herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud Medicare, a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendant submitted or caused the submission of a false and fraudulent reimbursement claim for services purportedly provided to Patient C.B. on July 2, 2012.

10

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

## COUNT 2
## FALSE STATEMENT CONCERNING HEALTH CARE
## 18 U.S.C. § 1035(a)(2) and 2

34. Paragraphs 1 to 32 are incorporated by reference as if fully set out herein.

35. On or about July 13, 2012, in the Eastern District of Missouri,

### JOHN DAILEY

the defendant herein, knowingly and willfully made and used a materially false writing and document knowing the same contained materially false and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, or services, that is, the defendant created a materially false patient progress note for services purportedly provided to Patient C.W. on July 2, 2012.

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

Respectfully submitted,

CARRIE COSTANTIN
Acting United States Attorney

*Dorothy L. McMurtry*
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri  63102
(314) 539-2200

11

UNITED STATES OF AMERICA )
EASTERN DIVISION )
EASTERN DISTRICT OF MISSOURI )

I, Dorothy L. McMurtry, Assistant United States Attorney for the Eastern District of Missouri, being duly sworn, do say that the foregoing information is true as I verily believe.

_____
DOROTHY L. McMURTRY, #37727MO

Subscribed and sworn to before me this 29th day of June, 2017

_____
CLERK, U.S. DISTRICT COURT

By: _____
DEPUTY CLERK